No. 22-2420

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

EPIC SYSTEMS CORPORATION,
*Plaintiff-Appellee,*

v.

TATA CONSULTANCY SERVICES LIMITED & TATA AMERICA
INTERNATIONAL CORPORATION (dba TCS AMERICA),
*Defendants-Appellants.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin, No. 3:14-cv-00748 (Conley, J.)

## BRIEF OF PLAINTIFF-APPELLEE EPIC SYSTEMS CORPORATION

Nick G. Saros
JENNER & BLOCK LLP
515 South Flower Street
Suite 3300
Los Angeles, CA 90071
213-239-5100
nsaros@jenner.com

Michael T. Brody
  *Counsel of Record*
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
312-222-9350
mbrody@jenner.com

Kristin G. Noel
QUARLES & BRADY LLP
33 East Main Street
Madison, WI 53703
608-251-5000
kristin.noel@quarles.com

*Attorneys for Plaintiff-Appellee Epic Systems Corporation*

<u>CIRCUIT RULE 26.1 DISCLOSURE STATEMENT</u>

Appellate Court No. <u>No. 22-2420</u>

Short Caption: <u>Epic Systems Corporation v. Tata Consultancy Services Limited, et al.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[x]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Epic Systems Corporation</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

<u>Jenner & Block LLP; Quarles & Brady LLP</u>

(3)    If the party or amicus is a corporation:

  i)    Identify all of its parent corporations, if any; and
    <u>None</u>

  ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:
    <u>None</u>

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
  <u>N/A</u>

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
  <u>N/A</u>

Attorney's Signature <u>s/ Michael T. Brody</u>    Date: <u>December 16, 2022</u>    (new)

Attorney's Printed Name: <u>Michael T. Brody</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** <u>X</u>
                                                                                                       **No** <u> </u>

Address:    <u>353 North Clark Street</u>
            <u>Chicago, IL 60654-3456</u>

Phone Number: <u>312-923-2711</u>    Fax Number: <u>312-527-0484</u>

E-Mail Address: <u>mbrody@jenner.com</u>

<u>CIRCUIT RULE 26.1 DISCLOSURE STATEMENT</u>

Appellate Court No. <u>No. 22-2420</u>

Short Caption: <u>Epic Systems Corporation v. Tata Consultancy Services Limited, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[x]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Epic Systems Corporation</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Jenner & Block LLP; Quarles & Brady LLP</u>

(3)    If the party or amicus is a corporation:

    i)    Identify all of its parent corporations, if any; and

        <u>None</u>

    ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:

        <u>None</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature <u>s/ Nick G. Saros</u>    Date: <u>December 16, 2022 (new)</u>

Attorney's Printed Name: <u>Nick G. Saros</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes**

    **No**    <u>X</u>

Address:    <u>515 South Flower Street, Suite 3300</u>
        <u>Los Angeles, CA 90071</u>

Phone Number: <u>213-239-5175</u>    Fax Number: <u>213-239-5199</u>

E-Mail Address: <u>nsaros@jenner.com</u>

rev. 12/19 AK

<u>CIRCUIT RULE 26.1 DISCLOSURE STATEMENT</u>

Appellate Court No. <u>No. 22-2420</u>

Short Caption: <u>Epic Systems Corporation v. Tata Consultancy Services Limited, et al.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Epic Systems Corporation</u>

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

<u>Jenner & Block LLP; Quarles & Brady LLP</u>

(3)     If the party or amicus is a corporation:

     i)     Identify all of its parent corporations, if any; and
<u>None</u>

     ii)     list any publicly held company that owns 10% or more of the party's or amicus' stock:
<u>None</u>

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
<u>N/A</u>

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
<u>N/A</u>

Attorney's Signature <u>s/Kristin Graham Noel</u>     Date: <u>December 16, 2022</u>

Attorney's Printed Name: <u>Kristin Graham Noel</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** _____

                                                                           **No**     <u>x</u>

Address:     <u>33 East Main Street, Suite 900, Madison, WI 53703</u>

Phone Number: <u>(608) 251-5000</u>     Fax Number: <u>(608) 251-9166</u>

E-Mail Address: <u>kgn@quarles.com</u>

rev. 12/19 AK

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENTS ...........................................i

TABLE OF AUTHORITIES.................................................................vi

INTRODUCTION............................................................................. 1

JURISDICTIONAL STATEMENT...................................................... 3

ISSUES PRESENTED FOR REVIEW ............................................... 3

STATEMENT OF THE CASE ........................................................... 3

    A. The Parties. ............................................................................ 3

    B. TCS's Intentional Theft Of Trade Secrets. .............................. 4

    C. TCS's Litigation Misconduct.................................................. 7

    D. Jury Verdict And TCS's Post-Trial Motions.......................... 10

    E. The Prior Appeal ................................................................. 13

    F. Proceedings On Remand ..................................................... 18

STANDARD OF REVIEW .............................................................. 19

SUMMARY OF ARGUMENT.......................................................... 20

ARGUMENT .................................................................................. 21

I. THE AMENDED JUDGMENT COMPLIES WITH THIS COURT'S MANDATE
AND SHOULD BE AFFIRMED.................................................... 21

    A. The District Court Properly Interpreted The Limited Remand Issued
By This Court. ..................................................................... 21

    B. This Court Did Not Expand The District Court's Task Beyond
Adjusting The Punitive-Damages Award To Comply With The
"Outermost Limit" Of Due Process. ...................................... 23

II. TCS'S "FEDERAL COMMON LAW" ARGUMENTS WERE WAIVED OR
PROPERLY REJECTED IN THE FIRST APPEAL AND IN ANY EVENT LACK
MERIT...................................................................................... 27

    A. TCS's "Federal Common Law" Arguments Are Waived And Are
Incorrect Statements Of Law.............................................. 27

B. If This Court Entertains TCS's "Federal Common Law" Challenges, It Should Reject Them. ........................................................................ 35

III. TCS'S REQUEST THAT THIS COURT AWARD PUNITIVE DAMAGES OF $10 TO $25 MILLION REFLECTS TCS'S CONTINUING ATTEMPT TO ESCAPE RESPONSIBILITY FOR ITS WRONGFUL ACTIONS. ................................... 42

CONCLUSION ............................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*adidas America, Inc. v. Payless Shoesource, Inc.,*
No. CV 01-1655, 2008 WL 4279812 (D. Or. Sept. 12, 2008).....................40

*Beard v. Wexford Health Sources, Inc.,*
900 F.3d 951 (7th Cir. 2018) ...................................................26, 29, 30, 31

*BMW of North America, Inc. v. Gore,*
517 U.S. 559 (1996) .............................................................17, 36, 37, 40

*Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.,*
492 U.S. 257 (1989) .............................................................. 29, 30

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.,*
532 U.S. 424 (2001) ....................................................................... 30

*Cygnar v. City of Chicago,*
865 F.2d 827 (7th Cir. 1989) ....................................................... 34

*Deimer v. Cincinnati Sub-Zero Prods., Inc.,*
58 F.3d 341 (7th Cir. 1995) ........................................................ 19

*DeRance, Inc. v. PaineWebber Inc.,*
872 F.2d 1312 (7th Cir. 1989) ................................................... 40

*Donovan v. Penn Shipping Company,*
429 U.S. 648 (1977) ..................................................................... 32

*Epic Systems Corp. v. Tata Consultancy Servs. Ltd.,*
980 F.3d 1117 (7th Cir. 2020) ......................................... *passim*

*Erie Railroad Co. v. Tompkins,*
304 U.S. 64 (1938) ............................................................... 30, 32

*Estate of Escobedo v. Martin,*
702 F.3d 388 (7th Cir. 2012) ..................................................... 19

*Exxon Shipping Company v. Baker,*
554 U.S. 471 (2008) ........................................................... 31, 35

*In re Exxon Valdez,*
270 F.3d 1215 (9th Cir. 2001) ................................................... 43

*Gasperini v. Ctr. for Humanities, Inc.*,
518 U.S. 415 (1996) ........................................................ 28, 30

*Harmon v. Gordon*,
712 F.3d 1044 (7th Cir. 2013) ................................................ 32

*Honda Motor Company v. Oberg*,
512 U.S. 415 (1994) ........................................................ 31

*Houben v. Telular Corp.*,
309 F.3d 1028 (7th Cir. 2002) ................................................ 34

*Indiana Port Comm'n v. Bethlehem Steel Corp.*,
835 F.2d 1207 (7th Cir. 1987) ................................................ 26

*Inter Medical Supplies Ltd. v. EBI Medical Systems, Inc.*,
181 F.3d 446 (3d Cir. 1999) .................................................. 40

*Kaiser v. Johnson & Johnson*,
947 F.3d 996 (7th Cir. 2020) ............................................. 30, 33

*Kapelanski v. Johnson*,
390 F.3d 525 (7th Cir. 2004) ................................................ 33

*Kunz v. DeFelice*,
538 F.3d 667 (7th Cir. 2008) ................................................ 20

*Lampley v. Onyx Acceptance Corp.*,
340 F.3d 478 (7th Cir. 2003) ................................................ 34

*Payne v. Jones*,
711 F.3d 85 (2d Cir. 2013) .................................................. 32

*Perez v. Z Frank Oldsmobile, Inc.*,
223 F.3d 617 (7th Cir. 2000) ................................................ 33

*Republic Tobacco Company v. North Atlantic Trading Company*,
381 F.3d 717 (7th Cir. 2004) ................................................ 33

*Saccameno v. U.S. Bank Nat'l Ass'n*,
943 F.3d 1071 (7th Cir. 2019) ............................................... 33

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc*,
No. 15 Civ 211, 2021 WL 1553926 (S.D.N.Y. Apr. 20, 2021) ..................... 35

*Turley v. ISG Lackawanna, Inc.*,
774 F.3d 140 (2d Cir. 2014) ................................................. 32

*United States v. Husband,*
   312 F.3d 247 (7th Cir. 2002) ............................................................ 19, 21

*United States v. Parker,*
   101 F.3d 527 (7th Cir. 1996) .....................................................19, 21, 23

*United States v. Payne,*
   102 F.3d 289 (7th Cir. 1996) ................................................................. 19

*United States v. Polland,*
   56 F.3d 776 (7th Cir. 1995) ................................................................... 21

*United States v. Purham,*
   795 F.3d 761 (7th Cir. 2015) ................................................................. 19

**Statutes**

28 U.S.C. § 1961(a) ...................................................................................... 43

**Other Authorities**

Reeba Zachariah, *TCS To Spend $320 Million On Marathons*, Times
   of India (July 22, 2021),
   https://timesofindia.indiatimes.com/business/india-
   business/tcs-to-spend-320mn-on-
   marathons/articleshow/84623876.cms.............................................. 44-45

# INTRODUCTION

TCS[1] invites this Court to re-assess the evidence and craft a new punitive-damages award inconsistent with the jury's verdict. Minimizing its wrongful, intentional acts that gave rise to Epic's claims, and TCS's litigation misconduct, TCS makes arguments the jury and this Court previously rejected, and new arguments it did not make until after the first appeal in this case. TCS asks the Court to award a fraction of the amount the jury found necessary to punish and deter TCS, one of the world's largest companies.

This appeal does not come before the Court on a clean slate. This Court has already affirmed the basis for a substantial punitive award. This Court concluded that, "[w]ithout permission from Epic Systems," TCS took "thousands of documents containing Epic's confidential information and trade secrets" and then "used" that information "in an attempt to enter the United States health-record-software market, steal Epic's client, and address key gaps in TCS's own Med Mantra software." *Epic Systems Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1123 (7th Cir. 2020) ("*Epic I*"). When asked about this conduct, "TCS employees were less than forthcoming" and "multiple TCS employees lied" about their actions. In litigation, "TCS … failed to preserve relevant evidence," leading to the sanction of "an adverse-inference instruction." *Id.* at 1126. This Court

---

[1] Epic Systems Corporation ("Epic") refers to defendants Tata Consultancy Services Limited and Tata America International Corporation (dba TCS America) as "TCS." Some actions were taken by Tata Consultancy Services, others by Tata America, but the distinction does not matter for any issue in this appeal.

held that the jury could have concluded, based on the trial evidence and the adverse-inference instruction resulting from TCS's litigation misconduct, "that TCS used Epic's stolen confidential information, including trade secrets …. for a variety of purposes," including "attempting to sell Med Mantra to Kaiser, one of Epic's largest customers; attempting to enter the United States market and compete directly with Epic; and addressing any key gaps in Med Mantra, potentially by improving the product." *Id.* at 1131. These facts, and others, led the jury to award substantial punitive damages and the district court to uphold punitive damages on three occasions.

This Court agreed, holding that punitive damages were proper and that punitive damages of $140 million were consistent with the Due Process Clause. Following the rule of constitutional avoidance, this Court reached the due process issue only after resolving TCS's non-constitutional arguments. *Id.* at 1137-45. This Court's prior opinion resolved every challenge TCS raised on appeal regarding punitive damages and identified certain arguments TCS had not raised and had therefore waived. On remand, the district court faithfully applied this Court's instructions, evaluated TCS's arguments, and entered an amended punitive-damages judgment of $140 million.

This Court's remand was not an invitation to re-raise rejected arguments, raise new arguments, or ask either the district court or this Court to put itself in the place of the jury to re-evaluate the evidence and enter a different award. TCS has had every chance to argue its conduct does not merit substantial punishment. Beginning with the jury verdict in 2016, it has lost that argument

at every turn.  All the while, TCS has avoided paying Epic what it owes.  It is time

to end this case.  The amended judgment should be affirmed.

## JURISDICTIONAL STATEMENT

TCS's jurisdictional statement is complete and correct.

## ISSUES PRESENTED FOR REVIEW

1.  Whether the district court complied with this Court's mandate when

it evaluated the arguments raised by TCS and entered a $140 million punitive-

damages award in accordance with this Court's prior opinion, the factual record,

and the jury's verdict?

2.  Whether TCS's federal common law arguments are waived,

unsupported by the law, and meritless?

## STATEMENT OF THE CASE[2]

**A.    The Parties.**

"Epic Systems is a leading developer of electronic-health-record software."

*Epic I*, 980 F.3d at 1124.  Epic licenses its software to customers, including

leading hospitals in the United States "to fit the customer's specific needs."  *Id.*

A customer may "customize the software to ensure it operates properly within

the customer's" needs.  *Id.*  To allow its customers to "update and test their

systems," Epic provides its customers with access to "a web portal called

'UserWeb'" with access to "administrative guides, training materials, software

---

[2] The Statement of the Case quotes extensively from this Court's opinion in *Epic I*, supplemented with additional facts and procedural details relevant to the issues on appeal.

3

updates," and "confidential information about Epic's health-record software." "Epic restricts who can access" UserWeb. *Id.*

In 2003, Kaiser Permanente, Epic's largest customer, licensed "a Kaiser-specific version of Epic's electronic-health-record software," known as KP HealthConnect. Implementing that software "is highly complex; testing and tweaking it after each update is complicated and time consuming. For help with these tasks, Kaiser hired TCS in 2011." *Id.* at 1124. TCS provides information-technology services, like software testing and consulting, on a global basis. TCS is an information technology services consulting business employing more than 300,000 employees. It is owned by Tata Group, one of the world's largest companies. (*See* R.901, 33-34.)[3] In 2014, TCS generated $15.5 billion in global revenue and $3.5 billion in profit. (R.870; R.898, 106:17-21.) TCS also has its own electronic-health-record software, Med Mantra, which at the time it predominately sold in India. *Epic I*, 980 F.3d at 1124. Aware of this conflict, Epic and Kaiser imposed stringent rules for TCS to follow while working on Kaiser's account. *Id.* at 1124-25.

### B. TCS's Intentional Theft Of Trade Secrets.

"TCS was required to perform all services related to KP HealthConnect at Kaiser offices in the United States or off-shore development centers" and "TCS was required to follow strict security protocols at the offshore development

---

[3] Citations to "R.__" are to the district court docket, No. 14-cv-00748 (W.D. Wis.). Citations to "App. Dkt. ___" are to the appeal in *Epic I,* Nos. 19-1528, 19-1613 (7th Cir.).

centers," which included a firewall separating it from TCS's systems. *Id.* at 1125. TCS repeatedly requested full access to UserWeb, which Epic repeatedly declined to grant. *Id.*

In an audit of TCS's compliance with security procedures, Kaiser discovered that TCS employees in the Offshore Development Centers ("ODC") had access to the internet, and thus to TCS's network. (R.922-15, 40:4-7, 51:2-52:23, 54:4-9 (McCarthy).) To eliminate this risk, yet to allow ODC employees to access TCS information for non-Kaiser matters, Kaiser allowed two computers in the ODC—known as "kiosk computers"—to access the TCS network, including "shared drives, e-mail servers, and TCS's knowledge management system." (R.901, 143:3-19 (Muthuswami); R.922-15, 65:24-66:8, 69:13-70:19, 71:20-72:8, 72:23-24 (McCarthy); Ex.0537.) The kiosk computers were not "to be used to access" Epic materials. (R.901, 143:3-19 (Muthuswami).)

In "late 2011, TCS found a way to gain unfettered access to all the information available on UserWeb: the key was Ramesh Gajaram." "TCS hired Gajaram to work on the Kaiser account" from Chennai, India. Prior to working for TCS, "Gajaram falsely identified himself to Epic as a Kaiser employee, and Epic granted Gajaram full access to UserWeb." "Gajaram informed his superior at TCS, Mukesh Kumar, that he still had access to UserWeb. At Kumar's request, Gajaram accessed the UserWeb portal." *Epic I*, 980 F.3d at 1125. Gajaram shared his credentials with other employees at the Chennai ODC. *Id.*

Using Gajaram's credentials, TCS employees frequently accessed the UserWeb through the kiosk computer to copy and download Epic documents to

TCS email, to other email servers, and to other users outside of the Kaiser or Epic networks. (R.902, 41:3-15, 57:11-15, 57:25-58:18 (Menon).) TCS appointed an information security coordinator to make sure TSC employees honored Kaiser's and Epic's security controls. (*See* R.891, 62:1-63:17 (Gajaram).) The security officer in Chennai was Gajaram. (*Id.*, 63:18-20.) "A few years later, Gajaram transferred to TCS's Portland, Oregon office; he again shared his UserWeb login credentials with at least one other TCS employee." *Epic I*, 980 F.3d at 1125.

"[D]ozens of TCS employees gained unauthorized access to UserWeb." They "accessed UserWeb thousands of times and downloaded over 6,000 documents (1,600 unique documents) totaling over 150,000 pages. These documents contained Epic's confidential information, including some of its trade secrets. And not all of this information related to TCS's work for Kaiser; employees downloaded information related to a medical-laboratory module that Kaiser does not license from Epic." *Id.* The full extent of that access could not be determined at trial due to TCS's document destruction.

In June 2014, Epic received an unsolicited email from TCS employee Phillipe Guionnet indicating that TCS personnel had been accessing Epic's UserWeb without authorization and that information obtained through that access was being used by TCS to support its competing Med Mantra software. (Ex.0096.) Guionnet revealed TCS leaders in the United States and in India were complicit in TCS's scheme to access UserWeb (R.890, 9:13-11:23), that a credential from a single individual had been used by TCS to access and download

information from UserWeb (Ex.0096_0001), and the purpose was to use information and documents to benefit TCS's competing product (Ex.0096).

Epic took action. Its investigation revealed approximately 75% of the downloaded documents included trade secrets. (R.900, 25:12-26:2 (Martin).) For example, Gajaram's credentials were used to download "the Chronicles Programmer's Guide," a several-thousand-page document containing information about Epic's database management capabilities, how it stores information, and other unique information necessary to have a database tuned for healthcare applications. (R.889, 157:20-159:19 (Faulkner); Ex.2126.) UserWeb documents were viewed using Gajaram's credentials more than 100,000 times. (R.895, 164:17-165:5 (Martin).)

After Epic cancelled Gajaram's UserWeb access, Gajaram tried to obtain access by again falsely identifying himself as a Kaiser employee. (*See* R.891, 68:19-75:5; Exs.0122-0124.) Kaiser confronted Gajaram regarding his downloading of Epic data. (R.902, 40:15-18 (Menon); R.891, 75:8-15 (Gajaram).) Gajaram denied downloading any Epic materials, but when presented with downloaded logs associated with his account, Gajaram admitted he had provided his access credentials to other TCS employees. (R.891, 75:16-76:25.)

Epic filed suit on October 31, 2014. (R.1.)

### C. TCS's Litigation Misconduct.

The conduct that caused the district court to issue an adverse-inference instruction is detailed in Epic's briefs in the first appeal (App. Dkt. 28, Epic Resp. Br. 19-21, 37-39, 59-60) and in the district court (R.537 at 30-33, 40-44; R.709).

The evidence showed "TCS employees were less than forthcoming during Kaiser's investigation; multiple TCS employees lied to investigators about TCS's access to UserWeb." *Epic I*, 980 F.3d at 1126. When forced to investigate, "TCS' executives downplayed the issue" regarding the misuse of Epic's portal. (Ex.0462A_0009.) TCS failed to preserve information as Kaiser demanded. (Ex.0713_0006-0007.) TCS never identified who accessed Epic's trade secrets and confidential information, or what happened to that information. (R.895, 49:5-50:12 (Laykin); R.902, 61:19-62:14 (Menon).) TCS advised Kaiser the wrongdoing was merely "individual lapses." (Ex.0173.) (*See* App. Dkt. 28, Epic Resp. Br. 14-15.)

TCS's misconduct continued into the litigation. "During a contentious year-and-a-half discovery process, Epic learned that TCS had failed to preserve relevant evidence. The district court sanctioned TCS for its discovery failures by ultimately providing the jury with an adverse-inference instruction." *Epic I*, 980 F.3d at 1126. The jury heard TCS manager Mahendra Pandian testify his supervisor told him to "suppress the truth." (R.922-19, 107:24-109:12.)

The "suppress the truth" campaign took many forms. Failure to preserve records of copying and use was a particular problem. Aware of Guionnet's report in June 2014 (Ex.0096), told by Kaiser to preserve evidence in August 2014 (Ex.0713_0006-0007), and aware of this suit on October 31, 2014 (R.1), TCS did not preserve electronic records until 2016 (R.903, 10:15-11:2 (Rubin)). In the meantime, potential incriminating evidence was lost.

Epic's expert demonstrated the ways TCS failed to preserve critical evidence, allowing it to be destroyed:

- TCS failed to preserve "proxy logs" that would show who at TCS accessed Epic's UserWeb, and when. (R.903, 11:10-14:7 (Rubin).) TCS typically reviews proxy logs during investigations (R.902, 22:25-23:5 (Menon); *see* R.922-13, 88:23-89:7, 92:7-93:10 (Kumar)), but it chose not to do so even though Kaiser and a TCS electronic security employee advised TCS to preserve the logs (Exs.0713_0006-0007, 0732; R.902, 47:16-51:1, 57:19-59:13 (Menon)).

- TCS failed to image computers to preserve their contents. Epic's expert looked at 32 computers used by 25 TCS employees believed to have accessed UserWeb. None was forensically imaged by TCS. (R.903, 14:25-17:2 (Rubin).) As a result, Epic's expert was unable to analyze what the users had done. (*See id.*, 16:17-17:2, 18:12-19.)

- TCS failed to preserve the two kiosk computers used to access Epic's UserWeb, copy information, and send that information to others. (*See* R.891, 58:1-18 (Gajaram).) Notwithstanding TCS's sophistication as a technology consultant, one forensic image was corrupt—the image was overwritten with another forensic image, making its data unusable and "render[ing] the rest of the drive as kind of an unstructured block of data, kind of like a big blob." (R.903, 18:9-11 (Rubin).) As to the second kiosk computer, one month before the computer was imaged, TCS reinstalled

the computer's operating system, which wiped away the prior information. (*Id.*, 20:11-25.)

In addition, Epic presented evidence that TCS concealed witnesses and those who testified were not truthful. (App. Dkt. 28, Epic Resp. Br. 13, 18-19, 58.) In the prior appeal, TCS even conceded its employees "lied to the investigators or were less than forthcoming." (App. Dkt. 19, TCS Opening Br. 20.)

### D. Jury Verdict And TCS's Post-Trial Motions.

"The district court bifurcated proceedings into a liability phase and a damages phase. The liability phase began in April 2016. The jury returned a verdict in favor of Epic on all claims[.]" *Epic I*, 980 F.3d at 1126.

In the damages phase, "Epic presented two witnesses: Stirling Martin and Britven. Martin used a chart that both identified which Epic modules were reflected in TCS's downloads and identified, with a checkmark, which of these modules were reflected in the comparative analysis." *Id.* at 1127. As this Court explained, "TCS's internal communications show that TCS used this spreadsheet in an attempt to enter the United States health-record-software market, steal Epic's client, and address key gaps in TCS's own Med Mantra software." *Id.* at 1123. Martin provided factual testimony about "what stolen information was incorporated into the comparative analysis." Britven, an expert, "presented a calculation of the value TCS received by avoiding research and development costs they would have incurred without the stolen information. First, Britven identified how much it cost Epic to develop the modules related to the trade

secrets and confidential information that made their way into the comparative analysis." *Id.* at 1127. Britven reduced this number to exclude coding costs which conferred no benefit on TCS and to reflect "the decay in the value of technology over time. He reached an approximate benefit to TCS of about $200 million." *Id.*

"TCS called its damages expert—Brent Bersin—to testify about the value of the benefit TCS received related to the comparative analysis. Bersin testified that Epic was not entitled to an award of economic damages, but he also testified that Britven incorrectly calculated the damages. Specifically, Bersin pointed out that Britven's calculation failed to account for reduced labor costs in India; TCS could pay its India-based engineers about 30% to 40% less than Epic would have to pay its engineers to develop the same software." *Id.*

"[T]he district court gave the jury a special-verdict form concerning compensatory damages. The jury was asked to determine the amount of damages, if any, to which Epic was entitled based on (a) the 'Benefit of TCS's Use of [the] Comparative Analysis,' and (b) the 'Benefit of TCS's Use of Other Confidential Information.' The jury was also asked to determine whether Epic should be awarded punitive damages, and if so, in what amount." *Id.*

"The jury returned a $940 million total damages award: $140 million for uses of the comparative analysis, $100 million for uses of 'other' confidential information, and $700 million in punitive damages. The district court entered an injunction prohibiting TCS from using, possessing, or retaining any of Epic's trade secrets or confidential information." *Id.* at 1127.

TCS filed "three motions for judgment as a matter of law on liability and damages." *Id.*; (R.830; R.843; R.913.) Considering the first two motions, "[t]he district court upheld the jury's liability verdict and its $140 million compensatory-damages award based on TCS's uses of the comparative analysis, which contained Epic's information. But the district court struck the $100 million compensatory award for 'other uses' of Epic's confidential information[4] and reduced the punitive-damages award to $280 million based on a Wisconsin statutory cap on punitive damages. *See* Wis. Stat. § 895.043(6)." *Epic I*, 980 F.3d at 1127-28.

Regarding punitive damages, TCS argued, among other things: (1) the evidence did not support a punitive-damages award, including because Epic "failed to present a legally sufficient showing of actual damages" to support punitive damages under Wisconsin law, because TCS's conduct was not shown to be "willful and malicious," and because the evidence did not support a finding that TCS acted with "intentional disregard" of Epic's rights; (2) the punitive-damages award was capped at two times the compensatory-damages award as a matter of law; (3) a two-to-one punitive-damages award was "excessive" under Wisconsin common law; and (4) a two-to-one punitive-damages award was "grossly excessive" and violated TCS's due process rights. (R.914 at 46-67.) The district court rejected these arguments. (R.976 at 15-22.)

---

[4] This Court rejected Epic's cross-appeal of that ruling. *Epic I*, 980 F.3d at 1133-36. Damages for uses of "other" confidential information are no longer at issue.

"TCS then filed a post-judgment motion under Rules 50(b) and 59, again seeking judgment as a matter of law, or in the alternative, a new trial." *Epic I*, 980 F.3d at 1128. Concerning the punitive-damages award, TCS argued, among other things, that: (1) it had not waived its objection with respect to punitive damages; (2) punitive damages were not "available" as a matter of Wisconsin law and therefore should not have been submitted to the jury; (3) the jury did not have a "legally sufficient basis to award punitive damages"; (4) the punitive-damages award "must be vacated in light of the Court's ruling vacating the jury's compensatory damages award in part"; (5) the punitive-damages judgment exceeded Wisconsin's statutory cap; (6) the punitive-damages judgment was "disproportionate relative to TCS's culpable conduct"; (7) the punitive-damages judgment was "grossly excessive under the *Gore* and *State Farm* guideposts because Epic suffered no actual injury from TCS's conduct"; and (8) the punitive-damages judgment was "against the manifest weight of the evidence and justifie[d] a new trial." (R.997 at 45-68.) The district court stated the motion "largely repeat[ed] the same arguments previously raised in [TCS's] Rule 50(a) motion," (R.1022 at 1), and denied the motion in full, "leaving intact the $140 million compensatory award based on the comparative analysis." *Epic I*, 980 F.3d at 1128. "It also upheld the previously reduced $280 million punitive-damages award[.]" *Id.*

### E. The Prior Appeal

TCS appealed and raised two sets of arguments.

*Compensatory Damages.* "TCS argue[d] it [was] entitled to judgment as a matter of law on th[e] compensatory-damages award because there is no logical connection between the basis for liability and the jury's damages verdict." *Id.* at 1129.

This Court rejected TCS's argument. Without objection, the jury had been instructed it could award damages based on the "benefit conferred upon the defendant." *Id.* (citation omitted). Wisconsin law permitted this measure of damage for misappropriation of trade secrets and the other tort claims at issue. *Id.*

This Court rejected TCS's separate argument that Epic's evidence of use was insufficient to sustain its burden. The Court emphasized the factual nature of the determination. "Simply put, there is no single way to measure the benefit conferred on a defendant; the measurement is context dependent. The important considerations are that a judge or jury calculates the benefit to the defendant— not the loss to the plaintiff—and that this calculation is done with reasonable certainty." *Id.* at 1130. Concerning that evidence, the Court stated, "viewing the evidence in the light most favorable to Epic, the jury would have a sufficient basis to award Epic $140 million in compensatory damages based on the 'head start' TCS gained in development and competition. That 'head start,' the jury could conclude, came from TCS's use of the comparative analysis and thus the stolen information incorporated into that analysis. Furthermore, the jury could base its award on the benefit TCS received from avoided research and development

costs, not the cost Epic incurred when creating the same information." *Id.* at 1130.

After reviewing the evidence (*id.* at 1130-32), this Court concluded "[i]In sum, the jury had a sufficient basis to reach the $140 million 'comparative analysis' compensatory award. TCS's argument to the contrary relies on the assumption that the comparative analysis was used as nothing more than a stale marketing document. But the jury was presented with evidence that would allow it to conclude the comparative analysis was not just a stale marketing document; the comparative analysis—and therefore Epic's information—was used to help TCS evaluate its United States entry strategy and potentially even address key gaps in Med Mantra by improving the product. The evidence also allowed the jury to conclude that avoided research and development costs were a reasonable valuation of the benefit TCS received from using the comparative analysis, which contained stolen information. Likewise, using avoided research and development costs as the valuation of TCS's benefit, the jury could have reached a $140 million compensatory award. Importantly, it could do so without equating Epic's development costs ($306 million, by Britven's estimate) to TCS's benefit from using Epic's information in the comparative analysis. So, we agree with the district court's decisions to uphold this damages verdict and deny TCS's motion for a new trial." *Id.* at 1132-33.

*Punitive Damages.* This Court stated: "TCS presents four arguments challenging the $280 million punitive-damages award: First, TCS argues that, to receive punitive damages under Wisconsin law, the plaintiff must prove an actual

injury—which Epic did not do.  Second, TCS argues that the punitive-damages award here must be set aside because it may have been based on a claim that cannot support punitive damages as a matter of law.  Third, TCS argues that the punitive-damages award must be vacated and retried given the district court's decision to vacate the $100 million compensatory-damages award.  Finally, TCS argues the punitive-damages award is constitutionally excessive." *Id.* at 1137. The first three arguments implicated Wisconsin law.  The final argument, presented under Wisconsin and federal law, raised the due process limitation on punitive damages.

This Court rejected TCS's first argument that the compensatory-damages award did not support punitive damages.  After reviewing Wisconsin law, the Court stated:  "TCS is incorrect that Wisconsin law requires Epic to prove an 'actual injury' to obtain punitive damages.  Instead, punitive damages are available when compensatory damages are imposed, as they were in this case. Epic is therefore not barred from recovering punitive damages simply because compensatory damages were awarded for TCS's benefit rather than any injury Epic sustained." *Id.* at 1138.

The Court "quickly dispose[d]" of TCS's second argument. *Id.*  Certain of Epic's successful claims allowed recovery of punitive damages and the jury was instructed to base punitive damages on a claim that supported punitive damages. *Id.*

Third, the Court rejected the argument that vacating the "part b" damages required a new trial.  It held that the punitive damages were based on TCS's

improper conduct, not the claims themselves. "Whether the jury found that TCS received an additional benefit based on other confidential information does not affect the jury's assessment of TCS's overall conduct." *Id.* at 1140. Because the conduct underlying the award was not limited by vacating the "part b" damages, there was no need for a new trial.

Fourth, having decided TCS's non-constitutional arguments, the Court addressed TCS's argument that the punitive-damages award "violate[d] [TCS's] due process rights under the federal constitution and Wisconsin law." *Id.* at 1140. The Court "reminded" litigants, as it had in the past, that "the Constitution is not the most relevant limit to a federal court when assessing punitive damages, as it comes into play 'only after the assessment has been tested against statutory and common-law principles.'" *Id.* (citation omitted). Having resolved the other arguments TCS raised, the Court turned to the due process issue.[5]

Applying the factors identified in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568 (1996), the Court concluded that the $280 million award of punitive damages entered by the district court, reflecting Wisconsin's two-to-one statutory cap, exceeded the outer limit of punitive damages authorized by the Constitution, stating: "[i]n sum, considering the factors together, we conclude

---

[5] The Court noted Wisconsin applies a "virtually identical test" to the federal constitutional standard. *Epic I*, 980 F.3d at 1140-41 (citing *Trinity Evangelical Lutheran Church v. Tower Ins. Co.*, 661 N.W.2d 789, 800 (Wis. 2003)). The Court analyzed TCS's challenges to the punitive-damages award under federal case law.

that the maximum permissible award of punitive damages in this case is $140 million—a 1:1 ratio relative to the compensatory award. ... We therefore remand for the district court to amend its judgment and reduce punitive damages to, at most, $140 million." *Epic I*, 980 F.3d at 1145.

## F. Proceedings On Remand

On remand, the parties took different positions regarding the task the district court was directed to complete. Epic argued that this Court's opinion directed the district court on remand to enter a punitive-damages award in the amount of $140 million. (R.1041.) TCS presented an exhaustive challenge to the punitive-damages award, which the district court concluded "largely ignor[ed]" the prior jury verdict, the application of the statutory cap, the district court's prior consideration of challenges to the punitive-damages award, and the Seventh Circuit's ruling on those challenges. (R.1045 at 2.) The district court interpreted this Court's opinion to "charge[] [the district] court to exercise its discretion on remand and enter an award up to a constitutional maximum of $140 million *in light of* the record in the case as a whole." (*Id.*) Following that charge, the court reviewed the factors relevant to the order of punitive damages, including the *Gore* guideposts. Applying those factors to the evidence from the trial the district court supervised, that court concluded "the facts and circumstances of this case as a whole justify an award of $140 million in punitive damages, admittedly large as that amount may be." (R.1045 at 7.)

TCS appealed.

## STANDARD OF REVIEW

This Court reviews a district court's "determination of the scope of remand *de novo*." *United States v. Purham*, 795 F.3d 761, 764 (7th Cir. 2015). This Court will not consider arguments that fall outside of the scope of remand. *See United States v. Husband*, 312 F.3d 247, 250-51 (7th Cir. 2002) ("First, any issue that could have been but was not raised on appeal is waived and thus not remanded. ... Second, any issue conclusively decided by this court on the first appeal is not remanded.").

This Court considers waived any argument that a party failed to raise in the district court or in a prior appeal. *United States v. Payne*, 102 F.3d 289, 293 (7th Cir. 1996) (failing to "press an argument before the district court waives the right to present that argument on appeal") (citation omitted); *United States v. Parker*, 101 F.3d 527, 528 (7th Cir. 1996) (failing to raise argument during first appeal waives that argument in second appeal).

In reviewing the propriety of a jury's punitive-damages award, this Court "must view the evidence in the light most favorable to the nonmoving party and ascertain whether there exists 'any evidence upon which a jury could reach a verdict for the party producing it[.]'" *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 343-44 (7th Cir. 1995) (citations omitted). The Court must examine the evidence and all fair inferences in the light most favorable to the prevailing party and may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence. *Estate of Escobedo v. Martin*, 702 F.3d 388, 403-04 (7th Cir. 2012).

This Court reviews for abuse of discretion a district court's ruling on a non-constitutional challenge to a punitive-damages award as excessive. *See Kunz v. DeFelice*, 538 F.3d 667, 678 (7th Cir. 2008).

## SUMMARY OF ARGUMENT

In the first appeal, this Court affirmed Epic's entitlement to punitive damages and held the punitive damages awarded by the jury were limited by the Due Process Clause to $140 million. This Court remanded the case for the entry of an order in accordance with those instructions. On remand, the district court faithfully applied this Court's instructions, entered a punitive-damages award of $140 million, and disposed of TCS's remaining arguments regarding that award. The district court's application of this Court's remand order should be affirmed in all regards.

TCS now invites this Court to reevaluate the jury's verdict and apply a legal standard that TCS asserts is derived from federal common law. As with its other arguments about punitive damages, this contention is waived, and if not waived, has already been rejected. The jury decided the appropriate level of punitive damages necessary to punish TCS for its admitted wrongdoing and to deter it from similar, future misconduct. TCS's request for a reduction of that award, including its request that punitive damages be reduced to no more than $25 million, ignores the egregious facts that support the jury's award and would allow TCS to escape with a punitive-damages award that would be less than a rounding error on TCS's financial statements.

**ARGUMENT**

I. **THE AMENDED JUDGMENT COMPLIES WITH THIS COURT'S MANDATE AND SHOULD BE AFFIRMED.**

    A. **The District Court Properly Interpreted The Limited Remand Issued By This Court.**

The scope of the district court's duty on remand is defined by the appellate court's opinion and mandate. When this Court "identifies a discrete, particular error that can be corrected on remand without the need for a redetermination of other issues, the district court is limited to correcting that error." *Parker*, 101 F.3d at 528; *see also United States v. Polland*, 56 F.3d 776, 777 (7th Cir. 1995). A remand does not revive issues that have been decided or waived: The scope of remand does not include "any issue conclusively decided by this court on the first appeal" or "any issue that could have been but was not raised on appeal." *Husband*, 312 F.3d at 250-51; *see also* TCS Br. 26 ("If an issue has already been decided by this Court, it does not fall within the scope of remand.").

In light of these principles, this Court's mandate in *Epic I* was clear. This Court concluded that a punitive-damages award greater than $140 million exceeded the outermost bounds of due process, while affirming the district court's judgment in all other respects. 980 F.3d at 1140-45. *Epic I* rejected all of TCS's non-constitutional challenges to the punitive-damages award, including its argument that Epic did not prove sufficient injury to warrant damages.

This Court accepted TCS's constitutional argument, vacating "the judgment of the district court awarding $280 million in punitive damage[s]," having concluded that $280 million "exceeds the outermost limit of the Due

Process guarantee in the Constitution." *Id.* at 1146. This Court instructed "the district court to reduce the punitive-damages award consistent with the analysis in [its] opinion," *id.*, and issued a limited remand "for the district court to amend its judgment and reduce punitive damages to, at most, $140 million," *id.* at 1145.

In short, this Court decided that a punitive-damages award of $140 million satisfied the constitutional due process standard, and that the rest of TCS's non-constitutional arguments for a reduction were meritless. The Court remanded for the district court to amend the punitive-damages award consistent with that decision; all other issues were outside the scope of remand.

On remand, the district court followed the Court's direction.

Epic requested that the district court on remand simply amend its judgment to enter a $140 million punitive-damages award, (Epic's Req. for Post-Remand Status Conf., at 2 (R.1035)), but the district court declined to do so. Instead, the district court understood the mandate to "charge[] this court to exercise its discretion on remand and enter an award up to a constitutional maximum of $140 million *in light of* the record in the case as a whole," (R.1045 at 2), and that it was "only being asked to decide on remand whether a twice reduced award of $140 million is constitutionally infirm," (*id.* at 7). As such, the district court invited briefing from the parties on "why the court should not award $140 million in punitive damages" (*id.* at 2 (citation omitted)), giving TCS one last chance to raise arguments within the scope of remand and consistent with this Court's opinion in *Epic I.*

After evaluating the parties' arguments, the district court concluded that the punitive-damages award should be reduced to $140 million. TCS had offered no basis for a further reduction of the award related to the "discrete, particular error that can be corrected on remand" that this Court had identified. *Parker*, 101 F.3d at 528. Instead, the district court concluded that "[s]ince Tata's arguments are largely unmoored from the constitutional considerations articulated by the Supreme Court in *Gore* and already applied by the Seventh Circuit as outlined above, this court can find no principled, constitutional basis for a further reduction, and defendant has offered neither additional reasons on remand for this court to reconsider the jury's findings nor its own analysis that defendants acted willfully and reprehensibly with the expectation and determination that they would not be caught." (R.1045 at 7.) "For all these reasons," the district court explained, "the facts and circumstances of this case as a whole justify an award of $140 million in punitive damages[.]" (*Id.*) Because the district court complied with this Court's mandate in entering that judgment, it should be affirmed.

**B.    This Court Did Not Expand The District Court's Task Beyond Adjusting The Punitive-Damages Award To Comply With The "Outermost Limit" Of Due Process.**

TCS contends "the district court did not properly interpret and apply this Court's mandate," because the district court should have granted relief based on a variety of arguments that have already been rejected or waived. TCS Br. 24 (capitalization altered). Yet a remand is not an invitation to raise arguments that were not previously raised or were lost on appeal.

First, the district court did not misconstrue the scope of remand. *See* TCS Br. 25. On remand, all that was left for the district court to do was amend the judgment consistent with this Court's constitutional analysis in the first appeal. Still, the district court did not "mechanically enter[] an award of $140 million," (*id.*) and instead evaluated arguments presented by TCS in light of the trial evidence and this Court's opinion. TCS's current appeal amounts to a quest for a new bench trial on punitive damages based on arguments the district court and this Court have considered and rejected. Enough is enough.

Relatedly, TCS is wrong that the district court should have considered "non-constitutional bas[e]s for a reduced award" on remand. *Id.* Those arguments were either raised and rejected, or else waived, by TCS in the first appeal. The district court gave TCS an opportunity to raise any other consideration relevant to its task on remand and then carefully evaluated each of TCS's arguments. It found that TCS had "rehash[ed] the same arguments made previously," by repackaging the constitutional arguments from the first appeal as non-constitutional. (R.1045 at 3.) None of those arguments, no matter how they were labeled, warranted further reduction of the award in light of *Epic I* and the trial record. (*Id.* at 3-7.)

Now, TCS asserts that this Court's remand must be read *not* to "order entry of a $140 million punitive damages award," TCS Br. 27, because there remained some undefined "potential" for the district court "to reduce punitive damages below the constitutional maximum," *id.* at 28. But there is no remaining

"potential to reduce punitive damages" on non-constitutional grounds, because all potential non-constitutional challenges have either been rejected or waived.

That the district court invited briefing as to "why the court should not award $140 million in punitive damages" does not mean that it was free to reconsider every possible issue relating to the record or to the damages award. The district court simply confirmed that no other considerations remained on the constitutionality of the punitive-damages award. (R.1045.) The constitutional inquiry compels courts to identify the "outermost limit" of due process, which is what this Court did, and then lower a jury's award only if it exceeds those outermost bounds, which is what the district court did. Application of the *Gore* guideposts does not produce a range of constitutionally permissible awards from which a court then chooses its preferred number at its discretion. Indeed, TCS cites no cases, and Epic is aware of none, in which a court applies the *Gore* guideposts, determines that a jury's award exceeded the highest constitutionally permissible award, lowers the award in accordance with the constitutional constraints, and then later decides to lower that number *further* based on other factors. And this makes good sense—the doctrine of constitutional avoidance compels courts to evaluate the due process limit only *after* a court has already evaluated any non-constitutional reasons to reduce a jury's award.

TCS relies on a sentence in this Court's prior opinion noting that "a federal court … can (and should) reduce a punitive damages award sometime before it reaches the outermost limits of due process." TCS Br. 29 (quoting *Epic I*, 980

F.3d at 1140).  That statement merely reiterates the age-old doctrine of constitutional avoidance.  This Court explained that a federal court ought to "assess[] punitive damages ... 'only after the assessment has been tested against statutory and common-law principles.'"  *Epic I*, 980 F.3d at 1140 (quoting *Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1086 (7th Cir. 2019)).  This Court explained that a court's constitutional analysis of any issue, such as punitive damages, "comes into play" only after the court has rejected any statutory or common-law bases for relief.  *Id.*; *Indiana Port Comm'n v. Bethlehem Steel Corp.*, 835 F.2d 1207, 1210 (7th Cir. 1987) (federal courts "avoid deciding constitutional questions if the case may be disposed of on other grounds presented"); *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 955 (7th Cir. 2018) (where decision was reversed on other grounds, declining to review due process limitation as "unnecessary constitutional analysis, which is to be avoided").

The Court made this point after rejecting TCS's three non-constitutional challenges to the excessiveness of the punitive-damages award based on state common law.  Only after having evaluated any bases for reducing the punitive-damages award "sometime before it reaches the outermost limits of due process" did the Court address TCS's constitutional argument, and then remand with instructions to reduce the punitive-damages award consistent with that analysis.

It does not matter that certain appellate courts have directed entry of judgment of a specific damages award in other cases.  *See* TCS Br. 27-28, 28

n.4. This Court's instruction on remand was clear—this Court had affirmed the jury's award and the district court's judgment in all respects except for the constitutional question, announced the constitutional cap, and remanded the case for an adjustment accordingly. It is equally clear that the Court was *not* instructing the district court on remand to revive waived or rejected arguments.

## II. TCS'S "FEDERAL COMMON LAW" ARGUMENTS WERE WAIVED OR PROPERLY REJECTED IN THE FIRST APPEAL AND IN ANY EVENT LACK MERIT.

In this second appeal, TCS manufactures a "federal common law" theory and argues that the district court erred in not reducing the award on the basis of certain arbitrary "federal common law" factors on remand. First, TCS argues that the economic harm Epic suffered was insufficient to support the punitive-damages award, TCS Br. 32-36; second, that the punitive damages are higher than necessary to serve a deterrent purpose, *id.* at 36-42; and third, that the punitive-damages award is an outlier, *id.* at 42-52. But TCS's "federal common law" theory is unsupported by the law and is waived. If the Court considers these arguments, however, they reflect the same substantive considerations that this Court evaluated under the *Gore* guideposts in the first appeal and properly rejected as lacking merit.

### A. TCS's "Federal Common Law" Arguments Are Waived And Are Incorrect Statements Of Law.

Six years after the end of trial, TCS now argues that the district court erred in not further reducing the punitive-damages award under "federal common law," which TCS contends is separate from the constitutional review this Court previously conducted. TCS Br. 30-36. In this vein, TCS reels off a list of factors—

without citations—creating a "federal common law" test from whole cloth. *Id.* at 35. Not only is any such argument waived because TCS failed to raise it earlier, but it is wrong: Where state law supplies the rule of decision, federal courts are tasked with applying state law and federal constitutional law—all of which has already occurred here.

First, TCS has waived any argument that "federal common law" separately warrants a reduction of the punitive-damages award. In *Epic I*, TCS correctly explained to this Court that a "federal court sitting in diversity looks to state law in determining the propriety of punitive damages," citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 428-29 (1996). (App. Dkt. 19, TCS Opening Br. 60; App. Dkt. 57, TCS Pet. for Rehearing 17, n.2 (same); TCS Mem. in Supp. of Renewed Mot. for Judgment as a Matter of Law or a New Trial or Remittitur Pursuant to Rules 50(b), 59, & 60(b), R.997 at 45 (same).) This Court agreed: It held that in a case that arises under diversity or supplemental jurisdiction, "federal courts are 'obliged to follow state decisional law, as well as all other state law.'" *Epic I*, 980 F.3d at 1128 (quoting *Houben v. Telular Corp.*, 309 F.3d 1028, 1032 (7th Cir. 2002)). This Court explained, "when state law provides the basis for liability, the punitive-damages award must be consistent with state law." *Id.* Because the "award of punitive damages had to be based on Epic's Wisconsin law" claims, Wisconsin law—not federal common law—"applies to the parties' substantive challenges of these damages awards." *Id.*; *see also id.* at 1136-37. TCS's "federal common law" arguments are inconsistent with this Court's holdings and TCS's previous presentations to this Court.

Second, this Court's ruling is correct:  Where a federal court sitting in diversity applies state substantive law as the rule of decision, it must consider an excessiveness challenge to punitive damages under state law or the federal Constitution.  There is no federal common law of punitive damages applicable to state-law claims.  When a federal court evaluates punitive damages in a dispute arising under state law, "the Constitution imposes the only federal restraint." *Beard*, 900 F.3d at 955.

This holding is consistent with established Supreme Court precedent.  In *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257 (1989), the petitioner asked the Supreme Court "to hold that this award of punitive damages is excessive as a matter of federal common law."  *Id.* at 277. The Supreme Court declined the invitation "to craft some common-law standard of excessiveness."  *Id.* at 279.  After noting that petitioners had failed to direct the Court to "a developed body of federal law," the Court concluded that "these are matters of state, and not federal, common law."  *Id.* at 277, 279.  The Supreme Court held "[i]t is not our role to review directly the award for excessiveness, or to substitute our judgment for that of the jury."  *Id.* at 278.  It explained that the Court's only federal inquiry was a procedural one—*i.e.*, to determine "whether the Court of Appeals erred in finding that the [d]istrict [c]ourt did not abuse its discretion in refusing to grant petitioners' motion, under Federal Rule of Civil Procedure 59, for a new trial or remittitur."[6]  *Id.*  By contrast,

---

[6] TCS sought judgment as a matter of law, a new trial, or a remittitur under Federal Rules of Civil Procedure 50, 59, and 60.  (R.997.)  Those motions were

the Court explained that the substantive standard of review was supplied by state law: "In a diversity action, or in any other lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law." *Id.*; *accord Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.,* 532 U.S. 424, 433 (2001).

The Supreme Court reaffirmed this point in *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 428-29 (1996). There, the Supreme Court explained that "[f]or rights that are state created, state law governs the amount properly awarded as punitive damages, subject to an ultimate federal constitutional check for exorbitancy." 518 U.S. at 430 n.12.[7] This Court and the district court have already evaluated the punitive-damages award under both state law and the "only federal restraint" that applies—the Constitution. *Beard*, 900 F.3d at 955.

---

denied by the district court, and those rulings were affirmed (or not challenged) in the prior appeal.

[7] Courts recognizing this doctrine trace their reasoning back to *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938). There, the Supreme Court recognized that "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. ... There is no federal general common law." *See Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1019 (7th Cir. 2020) (explaining that "state standards for reviewing damages awards are substantive law for *Erie* purposes," and that, accordingly, "when a federal jury awards compensatory damages in a state-law claim, state law determines whether that award is excessive" (citation omitted)).

Third, the cases TCS cites do not support its federal common law theory. *Honda Motor Company v. Oberg*, 512 U.S. 415 (1994), stands for the proposition that defendants must have a *procedural* right and opportunity to challenge a punitive-damages award they claim to be excessive under state law. *Honda Motor Company* did not hold that a separate ground exists for challenging punitive-damages awards under federal common law. Instead, it reaffirmed that while there may be federal procedural avenues for challenging a punitive-damages award, the substantive standard of review is based on state law and federal constitutional law. *Id.* at 418-20.

*Exxon Shipping Company v. Baker*, 554 U.S. 471 (2008), likewise does not support TCS's claim that the district court erred in failing to conduct a separate analysis of the award under federal common law. In *Exxon Shipping*, the Court concluded that the excessiveness of a punitive-damages award premised on a violation of federal admiralty law was governed by federal common law, in lieu of *Gore*, precisely because the case arose under federal admiralty jurisdiction. *Id.* at 501-02. The punitive damages were not based on a state-law claim.

The propriety of punitive-damages awards in suits arising under federal statutes may, depending on the statute, also be governed by federal common law. *Beard*, 900 F.3d at 955-56. But the claims in this case rise under neither the federal courts' common-law jurisdiction nor federal statutes, and when "cases ar[i]se under state law, the Constitution imposes the only federal restraint." *Id.* at 955. Thus, in *Beard* and in other cases, this Court has been clear about the substantive law that applies to the review of the propriety of a

punitive-damages award: state law for state-law causes of action, federal law for federal-law causes of action, and the federal Constitution for both.[8]  Notably, TCS has not identified, and Epic is not aware of, a *single* case that concludes that an award that is constitutional under *Gore* is excessive under a "federal common law" inquiry.

TCS tries to double down on its "federal common law" argument in a footnote in its brief that draws an unfounded distinction between "substantive challenges" and "non-constitutional excessiveness challenges."  TCS Br. 32 n.5. Aside from the fact that a party may not raise an argument in an undeveloped footnote, *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013), none of TCS's cases draw this manufactured distinction.[9]  What's more, under TCS's

_____

[8] Given this circuit's settled precedent about the rules that apply to the review of punitive-damages awards, the Court need not look to decisions from other circuits that have been more muddled on the issue.  For example, TCS cites several Second Circuit cases that have reflected confusion about how *Gore* interacts with older Second Circuit case law that is inapplicable here  *See, e.g., Payne v. Jones*, 711 F.3d 85, 96-97 (2d Cir. 2013) (querying whether *Gore* "abrogated the 'shocks the conscience' standard" that the Second Circuit previously applied to review punitive-damages awards); *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 164-65 (2d Cir. 2014) (in the wake of *Payne*, applying the *Gore* factors "under federal common law" for determining "whether the district court abused its discretion in determining that the punitive damages award was appropriate").

[9] In *Donovan v. Penn Shipping Company*, 429 U.S. 648 (1977), the Supreme Court explained that the "proper role of the trial and appellate courts in the federal system in reviewing the size of jury verdicts" is "a matter of federal law."  *Id.* at 649.  Yet the issue in *Donovan* was a procedural one: the Supreme Court "reaffirm[ed] the longstanding rule that a plaintiff in federal court, whether prosecuting a state or federal cause of action, may not appeal from a remittitur order he has accepted."  *Id.* at 650.  Under *Erie*, procedural questions in federal cases are governed by federal law.  *See generally Erie*, 304 U.S. 64.  *Donovan* did not say, as TCS asserts, that "state law applies to *substantive* challenges to

framework, "[s]ubstantive challenges generally refer to 'whether the evidence supports the damages awarded,'" TCS Br. 32 n.5—which is the nature of TCS's challenge here, *see id.* at 36-52—so TCS's challenge is "substantive" on its own terms and therefore governed by state law. To the extent any of TCS's "common law" arguments are in fact grounded in state law, TCS has also waived any new challenges based on state statutory or common law. *See Epic I*, 980 F.3d at 1145.

TCS's argument that "[i]t makes no sense for a court to defer to what is a transparently irrational jury determination" tries to transform TCS's unsuccessful plea to the jury that its misconduct did not deserve substantial punishment into a legal argument. TCS Br. 26. Yet courts properly afford "deference to a jury's assessment of damages," because "'the actual measure of damages is an exercise in fact-finding' and any rule on the scope of the judge's

---

punitive damages awards" while "federal common-law principles govern non-constitutional excessiveness challenges to punitive damages awards." TCS Br. 32 n.5. *Republic Tobacco Company v. North Atlantic Trading Company*, 381 F.3d 717, 735-36 (7th Cir. 2004), reiterates *Donovan*'s holding.

TCS also cites *Saccameno*, 943 F.3d at 1078, 1086, and *Perez v. Z Frank Oldsmobile, Inc.*, 223 F.3d 617, 624-25 (7th Cir. 2000), but these decisions merely restated the constitutional-avoidance principle described above and recognized that only state law and the federal Constitution provide the substantive standards for the review of a punitive-damages award based on a state-law cause of action. *See Saccameno*, 943 F.3d at 1086; *Perez*, 223 F.3d at 625. TCS's remaining cases likewise do not support its position. *Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004), addressed a constitutional challenge to the size of a punitive-damages award under *Gore*, rather than any "federal common law" framework. And *Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1020 (7th Cir. 2002), involved a challenge to the size of an award under state law, in which this Court rejected the defendant's "object[ion] that the punitive award is excessive even after remittitur" as "waive[d]." *Id.* at 1021.

control of the jury has Seventh Amendment implications." *Cygnar v. City of Chicago*, 865 F.2d 827, 847 (7th Cir. 1989) (citation omitted); *see also Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 486 (7th Cir. 2003) ("Reflecting our general deference to jury verdicts, we have never required the district court to adjust a jury's punitive damages verdict so that it is proportional, in the court's view, to the defendant's wickedness.  Such proportional adjustments are left to the jury itself." (citation omitted)).

Thus, this Court deferred to the jury's judgment in *Epic I*, explaining that "like the district court, we decide whether the jury had 'a legally sufficient evidentiary basis' for its verdict," and that the verdict can be reversed "only if no rational jury could have found in [Epic's] favor."  980 F.3d at 1129 (citations omitted).  This Court concluded that the jury's determination was supported by sufficient evidence in the record and that TCS had not met its burden for reversing the verdict on any non-constitutional ground.  *Id.* at 1129-46.  The measure of deference due to the jury on its damages award is therefore not within the scope of remand.  What's more, TCS's argument that federal courts have freewheeling authority under federal common law to reduce a jury's carefully considered punitive-damages award is inconsistent with the Seventh Amendment.  *Cf. Houben v. Telular Corp.*, 309 F.3d 1028, 1035 (7th Cir. 2002).  In any event, the district court did not enter judgment for a $140 million award just by pointing to the jury's judgment; instead it painstakingly explained why a $140 million award was appropriate in light of *Epic I* and the record.  (R.1045 at 3-7.)

**B.** **If This Court Entertains TCS's "Federal Common Law" Challenges, It Should Reject Them.**

Even if TCS had not waived its new "federal common law" argument, the "federal common law" factors that TCS asks this Court to consider are duplicative of the factors that this Court took into account in evaluating TCS's challenges in *Epic I*.[10] Indeed, TCS previously presented each of these challenges to the district court, both post-trial and post-remand, as a challenge to the punitive-damages award on state-law or federal constitutional grounds. (*See* R.914 at 46-67; R.997 at 45-68; R.1040.) Thus, if not waived as "federal common law" challenges, these arguments have either been accounted for in the constitutional cap or rejected.

This is precisely why the district court rejected TCS's arguments for a further reduction on remand. As the district court explained, TCS "rehash[ed] the same arguments made previously" to the district court, (R.1045 at 3), and failed to offer "additional reasons on remand for this court to reconsider the jury's findings nor [the court's] own analysis," (*id.* at 7). After evaluating TCS's arguments once again, the court found "no principled, constitutional basis for a further reduction" in punitive damages. (*Id.*) Thus, even if this Court considers

---

[10] Even in cases in which federal common law properly provides the substantive standard of review of a punitive-damages award in lieu of "any application of the constitutional standard," courts nonetheless apply largely the same standard as set forth in *Gore*. *See Exxon Shipping*, 554 U.S. at 494, 506-13; *see also, e.g.*, *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc*, No. 15 Civ 211, 2021 WL 1553926, at *8-11 (S.D.N.Y. Apr. 20, 2021) (citing *Epic* to apply a one-to-one ratio as a matter of federal common law under the Defend Trade Secrets Act).

the merits of TCS's arguments in this appeal, it should affirm the amended judgment.

1. TCS argues Epic's economic harm was insufficient to support the award. TCS Br. 36-39. TCS's argument repackages arguments it made on appeal the last time. Again, TCS attacks the punitive-damages award because "Epic suffered negligible actual economic harm" (*id.* at 37), damages "measured what it would have cost TCS to develop the information that it wrongly accessed," (*id.* at 38-39). In the prior appeal, TCS argued that "Epic did not suffer any actual injury caused by TCS's conduct, and the 'compensatory' damages award is based exclusively on a benefit-based disgorgement theory." (App. Dkt. 57, TCS Pet. for Rehearing at 18; *see also* App. Dkt. 19, TCS Opening Br. 61-62.) In fact, TCS submits the same exhibits in support of its arguments in both briefs. *Compare* A11-A30, *with* App. Dkt. 19 at A66-A85. The only difference is that TCS now appeals to "federal common law."

This repackaging does not make TCS's argument any more successful this time around. TCS's economic harm argument mirrors the first *Gore* guidepost, the reprehensibility of the conduct, which in part turns on whether "the harm caused was physical as opposed to economic." *Epic I*, 980 F.3d at 1141 (citations omitted); *see also Gore*, 517 U.S. at 576. In *Epic I*, this Court accounted for the fact that the harm at issue was economic rather than physical in evaluating the reprehensibility of the conduct under the Due Process Clause, and adjusted punitive damages accordingly. 980 F.3d at 1141. TCS cites no authority compelling a further reduction of the award on the same ground.

2.  TCS's second argument is that the compensatory damages served as adequate deterrence and that a lesser ratio of punitive to compensatory damages was appropriate.  TCS Br. 36-42.  This argument echoes the second *Gore* guidepost—that although "[p]unitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition," *Gore*, 517 U.S. at 568, one "indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff," *id.* at 580.  TCS reraises arguments it previously raised under this guidepost about the extent of Epic's injury and its relationship to the damages awarded.  *See Epic I*, 980 F.3d at 1142-43.  This Court already rejected this claim, explaining: "[M]ost of [TCS's] argument under this guidepost emphasizes the size of the compensatory award as a reason the punitive-damages award violates due process" and "TCS has thus waived any argument that the compensatory award is the incorrect denominator in the ratio analysis."  *Id.* at 1143.  Any further challenges to this ratio of compensatory damages to punitive damages were outside the scope of remand and are beyond the scope of review in this appeal.  And in any event, as this Court previously concluded, the one-to-one ratio of compensatory to punitive damages is appropriate under the *Gore* guideposts, given the seriousness of TCS's misconduct.  *Id.* at 1144-45.

TCS also argues for the first time that punitive damages should have been reduced because the injunction to which it was subject was "a costly exercise and a deterrent."  TCS Br. 40.  TCS waived this argument by failing to make it in the first appeal, and in any event, TCS cites no cases in support of this

argument. Epic is unaware of any case in which a court modified a judgment of damages for past action because the defendant reformed its conduct under the threat of an injunction after the entry of that judgment. To the contrary, a jury's award reflects appropriate deterrence and punishment based on the evidence presented at trial for the conduct engaged in prior to the judgment. Subsequent conduct is irrelevant.

In addition, TCS's claim of repentance is undermined by its own public statements about its conduct in this case. (R.1041, Epic Post-Remand Br. 14.) As late as October 2020, TCS stated in its public filings that it "has received legal advice to the effect that the Appeals Court has misapprehended the facts of the case while delivering its judgement and that the Company has correct and the strongest possible arguments … for re-hearing of the awards for both compensatory and punitive damages." (*Id.*) TCS has never, to Epic's knowledge, publicly acknowledged that what it did was wrong. Nor is it clear what TCS has actually done, if anything, to prevent a recurrence of its unlawful conduct as to Epic or others. At the time of the proceedings on remand, the TCS managers who supervised the wrongdoing were still in place. TCS had, however, fired the whistleblower who brought this episode to light. (*Id.* at 14-15.)

Finally, the idea that an intentional wrongdoer, who then "suppress[ed] the truth" to prevent discovery of its wrongdoing, should not have to pay punitive damages for its past wrongs because it has agreed not to engage in future wrongs for a limited period of time ignores why Wisconsin allows punitive damages. TCS engaged in conduct the jury found required punishment. Promising to follow the

law in the future is not punishment for stealing trade secrets it took hundreds of millions of dollars to create. Instead, following the law is what companies do every day. Nor does agreeing to follow the law deter future misconduct. Again, law-abiding companies do that without an injunction. TCS seeks to re-write the moral of this story, and Wisconsin law. To TCS, stealing trade secrets is only a problem if you are caught. If you are discovered and a plaintiff prevails after years of litigation, the only thing that happens is that you have to pay back your ill-gotten gain and promise not to do it again. That is, the remedy for your intentional tort is that you are placed where you would have been had you behaved honestly. That rule neither punishes nor deters.

Similarly, the suggestion that compensatory damages deter, and thus punitive damages are inapplicable, turns Wisconsin law on its head. In rejecting TCS's prior variation on this argument in the first appeal, this Court held that Wisconsin permits a jury to award a plaintiff the cost the defendant avoided by stealing the trade secret. That is a proper measure of damage, particularly in a case such as this in which the defendants have destroyed and concealed evidence concerning the actual use of stolen information. *Epic I*, 980 F.3d at 1131-32. This Court also held that Wisconsin law permits an award of punitive damages where compensatory damages are measured in precisely this manner. *Id.* at 1139-40. TCS would prefer the law to be different (it is not), or would prefer the jury to have reached a different conclusion (it did not). TCS's arguments, however, do not amount to a reason for federal common law to displace the considered judgment of this Court regarding the law of Wisconsin.

3.  Finally, as the third part of its manufactured "federal common law" inquiry, TCS argues that the punitive-damages award in this case is an "outlier," and therefore should be reduced. TCS Br. 42-52. Specifically, TCS argues that this Court should set aside or adjust an award where "the award is out of line compared to other awards in similar cases." *Id.* at 42. This argument closely mirrors the third guidepost from *Gore*—that the "third indicium of excessiveness" is comparing the punitive damages and penalties that "could be imposed for comparable misconduct." *Gore*, 517 U.S. at 583. As this Court noted in the first appeal, "TCS has made no argument about this guidepost and has thus waived any argument that it points toward the award being unconstitutional." *Epic I,* 980 F.3d at 1145. This Court nonetheless concluded that this "final guidepost does not point toward a $280 million or $140 million punitive-damages award being unconstitutional." *Id.* Thus, this "outlier" argument has been both waived *and* rejected.[11]

---

[11] TCS cites *DeRance, Inc. v. PaineWebber Inc.*, 872 F.2d 1312 (7th Cir. 1989), TCS Br. 34, 39, 41, 42, but that case preceded *Gore* and referred to the standards under Wisconsin law for evaluating the excessiveness of punitive damages and to federal law for reviewing punitive damages for *federal* causes of action. *Id.* at 1328. Wisconsin has since established the statutory ratio applied in this case. TCS again cites cases from its post-remand briefing—*Inter Medical Supplies Ltd. v. EBI Medical Systems, Inc.*, 181 F.3d 446 (3d Cir. 1999), and *adidas America, Inc. v. Payless Shoesource, Inc.*, No. CV 01-1655, 2008 WL 4279812 (D. Or. Sept. 12, 2008)—to argue that courts have reduced punitive damages in light of actual damages. TCS Br. 44-47; (R.1040, TCS Post-Remand Br. 12). But in both cases, the courts applied *Gore*, as this Court did in *Epic I. See also* (R.1041, Epic Post-Remand Br. 12 n.2) (collecting cases in which appellate courts have upheld punitive damages exceeding the two-to-one ratio permitted under Wisconsin law).

In any event, the punitive damages have been reduced multiple times—first by the district court under Wisconsin statutory law, and then by this Court based on the *Gore* factors. In doing so, both courts considered the punitive-damages awards in other cases. In its rulings on TCS's post-trial motions, the district court found that courts had routinely approved punitive damages under Wisconsin law of two-to-one or higher and did not find TCS's cases appropriate comparators. (R.976 at 19-20.) TCS's complaint that the district court described TCS as "'cherry-pick[ing]' Wisconsin cases 'not at all comparable to this one,'" is in fact a concession that TCS previously raised this argument and lost. TCS Br. 52. And it reflects the reality that TCS tries to paper over: Comparable cases do not exist because TCS's conduct was uniquely egregious—vastly more egregious than the conduct of any other defendant to face a trade secret suit in Wisconsin.

If this case is an "outlier," it is because TCS's conduct was extreme. Epic is the worldwide leader in electronic medical records. It achieved that position through skill, hard work, and zealous protection of its intellectual property. It created billions of dollars of value in this important field, employs thousands, and improves medical care and reduces costs through its efficient product offerings. TCS, a subsidiary of one of the world's largest companies and a huge enterprise in its own right, set its sights on stealing Epic's intellectual property assets through a concerted effort. Its theft was not casual—it stole hundreds of thousands of pages of material, took documents relating to product offerings its customer (Kaiser) did not even use, and took the Epic programming guide that explained what made Epic's software work. As this Court held, "TCS's internal

communications show that TCS used this spreadsheet in an attempt to enter the United States health-record-software market, steal Epic's client, and address key gaps in TCS's own Med Mantra software." *Epic I*, 980 F.3d at 1123.  When caught, TCS dissembled, dodged, and destroyed documents to conceal the truth. The punitive-damages award in this case is large because TCS's conduct was egregious, the harm immeasurable, and the potential harm vast.  The award is not an outlier:  It was TCS's conduct, as the jury found, that was an outlier.

## III.  TCS'S REQUEST THAT THIS COURT AWARD PUNITIVE DAMAGES OF $10 TO $25 MILLION REFLECTS TCS'S CONTINUING ATTEMPT TO ESCAPE RESPONSIBILITY FOR ITS WRONGFUL ACTIONS.

This Court has already reduced the punitive-damages award from $280 million to $140 million on due process grounds.  Now, TCS returns to this Court to request a further reduction to a punitive-damages award of between $10 million and $25 million.  TCS Br. 52.  In doing so, TCS invites this Court to ignore that the jury's selection of an award of punitive damages reflected the need to punish TCS for its wrongful conduct and to deter it from future misconduct.   The properly instructed jury determined that award after evaluating TCS's entire course of wrongful conduct.   The trial evidence demonstrated that from its senior management on down, TCS engaged in an intentional scheme to steal Epic's intellectual property, concealed its conduct, distracted investigators, and engaged in a concerted effort to, in its own words, "suppress the truth."  After the jury rendered its verdict, the district court that heard the evidence upheld the punitive-damages award, and this Court upheld the compensatory-damages award and a substantial punitive-damages award.

Despite judgment being entered in 2017, TCS has yet to pay any punitive damages.

TCS invites this Court to sidestep the jury's verdict, Epic's Seventh Amendment rights, and years of post-trial proceedings including in this Court. TCS argues that a punitive-damages award of more than "$10-25 million" would give Epic a "windfall." TCS Br. 52-53.

TCS's argument lacks any authority. TCS provides no legal basis, and Epic is aware of none, for this Court in a second appeal to substitute its judgment for the jury's award of damages, upheld on post-trial motions, and affirmed on appeal. As shown throughout this brief, any arguments TCS made for reducing that award have been rejected by the jury, denied on post-trial motions, and further rejected on appeal. If an argument has not been previously rejected, TCS's failure to raise it at the appropriate time constitutes a waiver. There is no legal or factual basis to enter the award TCS requests, or for that matter, any award other than the award entered by the jury and upheld below.

Moreover, TCS's argument invites this Court to permit TCS to escape with essentially no punishment for conduct already found to be deserving of substantial punishment. By not paying Epic in 2017, TCS was able to invest an additional $140 million in its business. TCS's reported net profit for fiscal years 2018 through 2022 reflects an average return on equity of approximately 45%.[12]

---

[12] Epic's $140 million award of punitive damages earns interest at the statutory rate in effect at the time of the judgment, 1.312%, compounded annually. 28 U.S.C. § 1961(a). Epic contends the award should earn interest from the date of the original judgment. *See In re Exxon Valdez*, 270 F.3d 1215 (9th Cir. 2001).

(R.1044-1 at 3.) By investing the judgment in its business, TCS has turned $140 million it owed but did not pay in 2017 into nearly $800 million today, a profit based on the passage of time in the approximate amount of $650 million. (*Id.* at 4-5.) Measured another way, had TCS invested $25 million on October 3, 2017, in its business, that sum would be sufficient today to satisfy the $140 million Epic was awarded in punitive damages. (*Id.* at 6-7.) TCS has already been able to reduce the financial impact of the jury's award by running the clock. Reducing the punitive-damages award as TCS requests would give *TCS* a windfall.

TCS's argument flouts the law of punitive damages. Under the law of Wisconsin, a jury may consider the wealth of the defendant in determining a jury award sufficient to punish it, and to deter it from future misconduct. In the punitive phase of the bifurcated trial, the jury heard that in the year in which TCS hatched its scheme, TCS had profits of $3.5 billion. (R.870; R.898, 106:17-21.) The jury considered this and other evidence in determining the award necessary to punish and deter TCS for its illegal conduct. TCS asks the Court to reduce that award to no more than $25 million, which is a mere 0.49% of its profits from last year. (R.1044-1 at 3.) After the jury's verdict, from 2018 through 2022, TCS reported profits totaling $22.7 billion. (*Id.*) It has been reported that TCS pays more than $25 million every year to promote its brand by sponsoring the New York City Marathon and other running events. *See* Reeba Zachariah, *TCS To Spend $320 Million On Marathons*, Times of India (July 22,

---

If, instead, interest runs from the date of the amended judgment, it will earn interest at approximately 2.85%, although for a shorter time.

2021), https://timesofindia.indiatimes.com/business/india-business/tcs-to-spend-320mn-on-marathons/articleshow/84623876.cms. To reduce that award as TCS now requests would permit TCS to escape with only paying punitive damages that amount to a rounding error.

## CONCLUSION

For the foregoing reasons, Epic respectfully requests that the Court affirm the district court's amended judgment in all respects.

Respectfully submitted,

EPIC SYSTEMS CORPORATION

By /s/ Michael T. Brody
    One of Its Attorneys

Nick G. Saros
JENNER & BLOCK LLP
515 South Flower Street
Suite 3300
Los Angeles, CA 90071
213-239-5100
nsaros@jenner.com

Michael T. Brody
  *Counsel of Record*
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
312-222-9350
mbrody@jenner.com

Kristin G. Noel
QUARLES & BRADY LLP
33 East Main Street
Madison, WI 53703
608-251-5000
kristin.noel@quarles.com

*Attorneys for Plaintiff-Appellee Epic Systems Corporation*

Dated:  December 16, 2022

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, according to the word count function of Microsoft Office Word 365, this brief contains 11,890 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 12 point Bookman Old Style for the main text and footnotes.

Dated: December 16, 2022

/s/ Michael T. Brody
Michael T. Brody

**CERTIFICATE OF SERVICE**

I, Michael T. Brody, an attorney, hereby certify that on December 16, 2022, I caused the **Brief Of Plaintiff-Appellee Epic Systems Corporation** to be electronically filed with the Clerk of the Court for the United States Court Of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Pursuant to ECF procedure (h)(2) and Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause 15 copies of the **Brief Of Plaintiff-Appellee Epic Systems Corporation** to be transmitted to the Court via UPS overnight delivery, delivery charge prepaid, within five days of that date.

/s/Michael T. Brody
Michael T. Brody